21-1632CR. We'll turn to the next case on the calendar, which is United States v. Pagett, 21-1632CR. I invite counsel to come up. And Mr. Michel, feel free to introduce yourself. To adjust the height, there's the button on the right side of the podium to get the microphones where you would like. And I understand you would like to reserve two of your ten minutes for rebuttal. Is that right? That is correct, Your Honor, if necessary. Very good. Well, I leave that to your discretion. And I appreciate that, Your Honor, and I will try not to take up too much of your time. Okay. Well, proceed at will. Thank you. Good morning. May it please the Court, Your Honors. My name is Richard E. Michel. I represent the Defendant Appellant Larry Pagett. And initially, I too want to thank you for the opportunity to argue in person and without a mask. It is indeed refreshing. Well, we're glad to have you all here. Thank you. Your Honor, on this appeal, this is a very disturbing case, obviously. And it's even more so because in reviewing the evidence which we contend on this appeal was not legally sufficient to disprove the defense of justification beyond a reasonable doubt. Unfortunately, in assessing the evidence, the sufficiency of the evidence, the jury did not have the ability to assess the validity of the defense. And in addition to that, evidence was kept from them, the same type of evidence that the government was presenting, the evidence was kept from them to establish the self-defense. Over a hundred years ago, in talking about justification and murder in the second degree, no less a personage than Justice Oliver Wendell Holmes in Brown v. United States said, and I quote, and I want to read it to you so I don't make any mistakes with it, that a detached reflection cannot be demanded in the presence of an uplifted knife. Now, in this case, obviously, you're going to say to me, what was the knife? And my response to that would be, the uplifted knife in this case was gang culture, the very same concept that the government embraced enthusiastically to prove its case. When it came time for the defense to present it as part of its case, the government just as enthusiastically rejected it. On this appeal, the government's position is that self-defense should never... evidence to show that because of the killing, he was attempting to solidify his position within the organization. So that's entirely different from what you're positing. You're positing that because your client knew that this fellow was an enforcer, that he took the matters into his own hand and shot him in the back and killed him, and that's self-defense. Our position is that... It's the first time I've ever seen a self-defense with the victim being shot in the back. And I tried a lot of cases in state court in violent felonies. And I know when Your Honor was on the Court of Appeals, you had a lot of cases. I don't ever recall a case in the New York Court of Appeals where self-defense, where you shot the person in the back and they didn't draw. I mean, I'm shocked that you got the self-defense. I'm shocked you got justification to argue to the jury. If I may, Your Honor, if I may. Excuse me, I apologize for interrupting. No, no. Go ahead. The point is, the point is with the gang culture, of course the government's position was he was trying to advance or maintain his position within the H. Ray Cripps gangster organization. That was the theory of the prosecution. But clearly part of the defense was that because of his knowledge of the way things operated in gangs, this is somebody who was the founder of this organization. He knew inside and out. He knew what goes on in these organizations and the language between them. It was a whole culture that he understood that this had nothing to do, Your Honor, with advancing a position in the organization. They may have bragged about it. I'm sorry, could we just separate, I thought you were going towards the justification defense. I am. But now I think I hear you going into the insufficient evidence of a bicar motive. Your Honor, they're interrelated. They're really interrelated in terms of the legal  Let's try to, if we could, maybe tease them apart. Because I can see a world where both exist. Where you could say he had a bicar motive, but in the particular circumstances, he had a self-defense, a decent self-defense argument. But I guess my question is, I'm sure we all watched the video. I mean, it just seems abundantly clear that after this victim walked by, your client pulled out a gun and just started pumping lead into him. And what I'm trying to understand is, if your argument is correct, that you should have had evidence about the gang culture and how your client could reasonably have feared for his life from the victim, why wouldn't that allow your client to lie in wait for the victim in a dark alley and shoot him before someday he is shot himself? What is the difference? Because of the duty to retreat, your Honor. Duty to retreat in the face of what? In the case of the victim. The victim was walking away. The video unambiguously shows him walking away. So what is he retreating from? Just answer that question. I'm confused by your question, Your Honor. When you say, what was he retreating from? Who are we speaking about? My client wasn't retreating from anybody. But he has a duty to retreat if he can. If he can with complete safety. But what is he retreating from? I don't understand. The guy's leaving the facility. He's got his back to your client. He's walking away. Your client can turn around and walk the other way. How is he going to walk? Where is he going to walk? Stay where he is. The point is, the point is, Your Honor, as the evidence established, there was only one way out of this place. And Mr. Phillips showed up with his two henchmen. One walks out ahead of him and is waiting outside. So your view, so hang on. So your view is that once Mr. Phillips showed up at the club, and that meant your client was trapped, and he was entitled to shoot the victim no matter what. No, that's not my position. My position is that as things developed, which my client would understand as things progressed, he understood that when he walked outside, if he allowed them to get outside ahead of him, which was the only way out of this club. That's what I'm saying. Your view is once he was, I guess in your view, trapped in the club, he was entitled to shoot his way out? Not shoot his way out. When he walked out, there was no question, there was no question what they were going to do. What about that text, Your Honor? Who told the jury that? Pardon? Who told the jury that? That was an inference to be drawn. From what? From the gang culture evidence that was presented, Your Honor. The fact of the matter is that the government presented evidence where Mr. Phillips texted a cohort of his. Did you argue that? Well, whoever argued it, did they argue it? I am here. They argued it? It was argued. And the jury rejected it? That's correct. The jury rejected it. I'm sorry, how is what Mr. Phillips texted to someone else relevant to your client's state of mind? All it does, Your Honor, is that I'm saying can there be any doubt that this is what was going to happen? But insofar as my client is concerned, the word before that was used, Your Honor, was fear. The test isn't fear. The test is a reasonable belief based on his knowledge of what the gang culture is. Exactly. Well, we've hit your eight-minute mark. Would you like to use any of your two minutes now or would you like to set them for rebuttal? I'll give you that option. All right. Let me save them then for later. Okay. Why don't we hear from the government? Thank you, Your Honors, and may it please the Court. Kevin Trowell. I'm an AUSA in the Eastern District of New York. I think in my adversary's oral presentation, he concedes what is sort of the implicit premise of the brief, which is that the justification defense in New York effectively excuses gang violence. That's, of course, not what the defense says, and it's very specific. Well, he's not trying to go that far, right? I mean, to be real, he is saying that given the circumstances of the brush or the bump in the nightclub, the fact there's only one exit, he is trying to make a circumstances-specific argument, right? Well, I think what he's focused on, as he put it just a moment ago, was gang culture, and so, therefore, the understanding that Mr. Patchett apparently had, although there was no evidence to support this assertion, that other members of other gangs saw him as a target. But putting aside whether my broad statement about what he thinks justification means is right or not, what he's focused entirely on, exclusively on, is Mr. Patchett's subjective belief. Let's assume it's true, and again, there's no evidence to support counsel's assertions about what their client believed, but assume that that's correct, that he believed he was in danger. The other part of the defense, as the Court of Appeals made clear and gets, is the objective element. And so, to Your Honor's point, as the victim ultimately is leaving, and Mr. Patchett is standing there, in the government's view, I think this is plain from the video, he initiates the bump. But put all of that aside. The question of what a reasonable, objectively reasonable person would do if they believed that there was an ambush waiting outside for them is not, as Your Honor noted, to shoot their way out. A reasonable person under those circumstances would alert the authorities, would call the police. There are an endless number of other options available in that circumstance that don't involve chasing down and executing a man in the club. And so I think our position, and as we've laid out in the brief, is that the Court can really address and dispense with the justification-related arguments at the threshold question. Our discussion today and your discussion with my adversary, I think, point to the same thing, and that is who started this, who started the encounter that resulted in the shooting? Who was the first to use deadly force? And the video makes absolutely clear it was Mr. Patchett. The bump was at most mere force, even if you accept their assertion about who started it or what it meant, even if all of that is true, and again, there's not a shred of evidence to support their assertions, still, it's mere force under Brown, which we discussed at length, and the resulting decision to pull a firearm, chase down, and shoot Mr. Phillip in the back is certainly not justified. And just briefly to address your point, Your Honor, we collect a number of cases, I think in footnote 11, where courts have rejected the idea of a justification defense when the victim is turned away and, in fact, leaving. You can't chase him down and execute him. Let me ask you about the release of the videotape to the news media during the course of the trial. Yes. Is that the usual practice of the Eastern District to allow that to be done? Well, in this case, we had a press inquiry, and so, yes, in response to a press inquiry, my understanding is that we would release public documents used at trial. We don't, as far as I'm aware, have a place where we're just handing it out. We don't send it proactively necessarily to the press. Yeah, and I know that Judge Kuntz warned the jury against watching it, but, geez, isn't that, I mean, that video is a pretty powerful video, and so now it's out in the press and people are talking about it, and I've got to believe jurors are well-intended folks, but they sometimes get caught up in conversations. And I know that there's no assertion that there was any kind of poisoning of the jury, but it's troubling to me. I recognize that there's a very strong right to a public trial, but when a piece of evidence then becomes part of the evening news, I mean, you know, I actually tried cases back in the days when we had cameras in the courtroom, so I tried several murder cases with the media right there, but this is allowing a piece of evidence that's in an evidence and then it could be part of the evening news. That happens with regularity in the Eastern District.  One is the jury, of course, had already seen it, and during deliberations they were entitled to see it and watch it as many times as they want. Right, sure, but so a jury sees it and then a juror goes to a local diner and everybody's talking about, oh, Molly, I'm a juror, isn't that interesting? And all of a sudden people are all talking about it. Well, I can say, Your Honor, that with respect to cases in the Eastern District and I'm sure others that attract press attention, El Chapo, R. Kelly, Keith Ranieri, I mean, in terms of the amount of press coverage. You have your share. I'm sorry? You have your share. We do, we do, but in terms of the discussion around the water cooler about a particular case, I don't think this is the one that really tees up the issue that Your Honor is addressing because, sure, the news covered it, but briefly, and it was covered using materials that had already been made available to the jury and that the jury was entitled to see as many times as they wanted in deliberations. And on top of that, the court, as it always does and always will, warned the jury against doing it. And so with those protections in place, with an unsealed exhibit that is part of the public domain, there just really is not another alternative, and I think the court and the government both took the path that is regularly taken. You wouldn't provide a copy of the confession, would you? I'm sorry? If someone asked for a copy of a confession, would you provide that to TV10? So a videotaped confession that's introduced to trial? No, no, just a written confession. Would you provide that if it was admitted into evidence? I mean, I can think back to my own trials, Your Honor, and I can think of pictures of cooperators that were released. Okay, fair enough. And what's good for the goose is good for the gander. Well, and can I just, just to clarify, the government didn't just unilaterally release this, right? Correct. You went to the court and you said, we've got a press inquiry, and then you asked the court,  That's correct, Your Honor. Can I just ask, what is the custom, again, in the Eastern District, during the course of a trial after exhibits are admitted into evidence? Do the parties typically each retain custody of those exhibits, or is it then the court itself, either the courtroom deputy or somebody who then takes custody, unless it's, say, a gun or drugs or something dangerous? The paper documents, are they retained by the court or by the parties? I think, Your Honor, that that varies judge by judge. I can think of examples in my own experience. It would be difficult for me to speak to all trials in the district, but I can think of instances in my own experience where a judge has taken a book of exhibits and kept that. I can also think of instances where the court has taken a book for purposes of having it during the trial or the hearing and then given it back at the end. And so I'm not sure that there's a uniform practice. Because that's my experience, is that, in my experience, it has varied from judge to judge, and that press inquiries quite often happen, and often they're directed to the court without the intermediary, without the intermediation of the parties whatsoever, and it's then the court that will, I guess, in my experience, simply afford the press the right to inspect and copy anything that's been admitted into evidence that is not under seal. But, again, I just don't know if, in terms of the practice, that's something that has differed in other districts. I've not personally had that experience. Thinking to my own trials, I think in most cases the inquiry came to our press office, and so then the discussion was between the government and the court to the extent that that discussion needed to happen. And not, as Your Honor described. But I'm not aware of a case or a law or a rule that would suggest it has to be one way or the other, and I have no doubt that it happens in both ways. And I would be curious maybe to hear from counsel when it's your time on rebuttal whether you have any other different experience with traditionally how these things are handled in courts. Unless there are further questions, we're happy to rest in our briefs. Thank you. Thank you very much. So, counsel, and I don't want to take up much of your rebuttal, but I would be just curious what your experience is in terms of the practice in at least the Eastern District. Your Honor, similar to what the United States Attorney represented to the court, my experience is pretty much the same, where it's a judge-by-judge determination, both on the state court level and the federal court level. Okay. And that's fine. I appreciate that. Evidently, I've got a more substantial hurdle here than I initially thought I did. So what I'm concerned about with the court is the conception of there being a chase down and shooting this individual in the back. First of all, you've got the testimony of Neil Jordan. Look at pages 147 of the record to 149. He's testifying that the bump came from either Philip or his cohort. Now, the point is that, of course, that's not imminent serious physical injury, a bump. It's what is conveyed to Mr. Padgett at that particular moment. Padgett is invited to a club to distribute or to advertise his wares as a rap musician. This fellow shows up. It's widely disseminated. He shows up with two other people who, it turns out, are armed, as is he. And he's hanging out at this club. There's some interaction. It's unclear what the interaction is. But look at Mr. Jordan's testimony at 147 to 149 about what transpires. There's the bump. Out comes the gun because it's an instantaneous reaction, and Padgett knows what's coming, and boom, that's the action. Your Honors, you look at that tape. There is no chase down in this case. There is no chasing after Mr. Philip. The only running— Just because Mr. Phillips could only get about one or two steps away. This is a small area, but this is not a chase down, Your Honor. Okay. I think we have your argument. I see a red light is on, so we thank you for your arguments, both sides. We appreciate it very much and really very helpful arguments. We will take the case under advisement.